**EXHIBIT 14**

Dockets.Justia.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Leo Stoller,                         )    05 B 64075
                                     )    Chicago, Illinois
                                     )    1:30 p.m.
                        Debtor.      )    August 31, 2006


EXCERPT (A) OF PROCEEDINGS BEFORE THE
HONORABLE JACK B. SCHMETTERER


APPEARANCES:

For Debtor:                    Mr. Richard Golding;

For Pure Fishing:              Mr. Wm. Factor;
                               Mr. Lance Johnson;

For Chapter 13 Trustee:        Mr. Mark Wheeler;


Court Reporter:                Jackleen DeFini, CSR, RPR
                               U.S. Courthouse
                               219 South Dearborn
                               Room 661
                               Chicago, Il.  60604.




FILED

SEP - 5 2006

JACK B. SCHMETTERER, BANKRUPTCY JUDGE
UNITED STATES BANKRUPTCY COURT

EXHIBIT 4

107

1              THE COURT:  I think we are ready for

2    final argument.  Are we not?  The question is whether

3    we do it tonight or tomorrow morning at 9:30.

4              MR. WHEELER:  Judge, I can't be here

5    tomorrow morning.

6              THE COURT:  Are you planning to

7    address the court?

8              MR. WHEELER:  Yes, Your Honor.

9              THE COURT:  How much time do you want

10   to talk?

11             MR. WHEELER:  Depends on when the

12   court wants to schedule this.  I can't be here

13   tomorrow morning.  I went back to my office to get my

14   keys and such --

15             THE COURT:  What I'm saying is how

16   much time will you need to address the court?

17             MR. WHEELER:  Not much, maybe ten

18   minutes.  The court's already pretty much articulated

19   my position.

20             THE COURT:  The court just asked a

21   question.

22             MR. WHEELER:  To summarize my position

23   to the court --

24             THE COURT:  You can do that now.  I

25   think that the other lawyers probably want to spend

EXHIBIT  4

108

1   more time in argument.  That's why I'm asking.  I

2   could hear the Chapter 13 trustee tonight and let him

3   depart.  And then I want to ask you folks whether or

4   not you want to argue right now or you would rather

5   argue tomorrow morning at 9:30.

6                    MR. JOHNSON:  If I may?  I did not

7   book a room for today.  I suppose I could.

8                    THE COURT:  Oh, yes, you're from out

9   of town.

10                   MR. JOHNSON:  Yes, we're here from

11  Washington D.C.  I would need probably no more than

12  15 minutes.

13                   THE COURT:  Would you prefer to do it

14  tonight?

15                   MR. JOHNSON:  If I could, Your Honor.

16  Most of my closing argument is, as you instructed, in

17  our proposed findings.

18                   THE COURT:  How much time would you

19  need, counsel?

20                   MR. GOLDING:  I would say probably 15

21  minutes to a half hour.

22                   THE COURT:  Okay.  Well, would you

23  like me to take a recess before we start?  We'll do

24  it now.

25                   MR. JOHNSON:  That would be fine, Your

EXHIBIT  14

109

1  Honor.

2            MR. GOLDING:  Whatever Your Honor --

3            THE COURT:  Are you ready to go?  Do

4  you want to go first, Trustee?

5            MR. WHEELER:  Sure, if the court's

6  prepared to make a decision on my motion.  Otherwise,

7  if it's going to hinge on the other arguments --

8            THE COURT:  I want to decide the Pure

9  motion first.  So maybe you want to reserve your

10 argument?

11            MR. WHEELER:  That's fine.

12            THE COURT:  All right.

13            Counsel for Pure, you need how long,

14 sir?

15            MR. JOHNSON:  No more than 15 minutes.

16 I will attempt to do it in even less time than that.

17            THE COURT:  Well, I assume part of

18 your argument is contained in your amended findings

19 of fact, conclusions of law.

20            MR. JOHNSON:  Yes, the vast majority

21 of that, Your Honor, 98 plus percent.

22            THE COURT:  And apart from that, what

23 do you want to say?

24            MR. JOHNSON:  Pure Fishing, we would

25 like to summarize -- not summarize, perhaps -- I note

EXHIBIT  4

110

1    for the court that in connection with today's

2    testimony by the debtor, he has not refuted or

3    explained away the numerous errors and omissions in

4    the petition and schedules that were identified in

5    our proposed findings.  Moreover, we heard repeated

6    testimony about a number of d/b/as or assumed name

7    entities that are asserted to be assumed names for

8    his corporate entities, Central, Mfg. Inc.  That,

9    however, is not the law.  The law for corporations is

10   that an assumed name must be registered with a state

11   entity.  For a proprietorship in Illinois, an assumed

12   name can be adopted without registration.

13              THE COURT:  To what extent is the

14   record issue and the formality  observation in

15   maintaining records and business related to the

16   motion -- the standards on the motion to dismiss --

17   pardon me, convert to Chapter 7?

18              MR. JOHNSON:  May I turn that over to

19   co-counsel, Mr. Factor, who is more skilled in those

20   areas, Your Honor, than I?

21              MR. FACTOR:  Thank you, Your Honor.

22   On the motion to convert there are a couple of

23   grounds, statutory grounds in 1307(c).  There is

24   also, and it's well-established by the Seventh

25   Circuit, a basis for converting or dismissing based

EXHIBIT  14

1    on a finding of bad faith.  And in connection with

2    the bad faith issue the Seventh Circuit enumerated

3    five or six, maybe seven different factors to

4    consider.  One of those is did the debtor file for

5    Chapter 13 to avoid denial of discharge or denial of

6    dischargeability on a specific debt.  That's one of

7    the factors from the Seventh Circuit in evaluating

8    the lack of good faith.

9                And it's our contention that if this

10    were in a Chapter 7 case, the debtor clearly would be

11    denied a discharge based on 727(a)(2) and 727(a)(3),

12    failure to keep books and records, destruction of

13    books and records.  So in a Chapter 7 the debtor

14    clearly would be denied a general discharge.

15                Moreover, in a Chapter 7, and this

16    doesn't relate to books and records, so I won't go

17    down that path, there are other reasons why the

18    debtor -- bad faith is evidence under section 727.

19    But the books and records issue, Your Honor, I think

20    is relevant because in Chapter 7 he would be denied a

21    general discharge, so he files for Chapter 13 instead

22    to avoid the consequences of his sloppy record

23    keeping, careless record keeping, perhaps intentional

24    destruction of records.  That's one reason.

25                The second reason is that the lack of

EXHIBIT 4

112

1    records evidences a general disregard for the

2    requirements of Chapter 13.  To be a Chapter 13

3    debtor you have to establish a regular income, and

4    you have to make -- you have to establish your

5    expenses.  And you match up your income with your

6    expenses.  You have disposable income and that's used

7    to pay back creditors.  Without records, we don't

8    know if the debtor is earning two million dollars a

9    year, or if the debtor is earning a dollar a year.

10            THE COURT:  Whose responsibility is it

11   to monitor the debtor's filings in Chapter 13 when

12   the debtor reports income and expenses?  It is partly

13   the creditors and partly the Chapter 13 trustee;

14   right?

15            MR. FACTOR:  To monitor?  Yes.  I

16   think the debtor also has --

17            THE COURT:  And the creditors or the

18   Chapter 13 trustee determine his income and expenses

19   from the records that we have learned about.

20            MR. FACTOR:  I don't see how that's

21   possible, Your Honor.  I don't see how that's

22   possible at all.  As I said before, we don't know

23   whether the debtor is taking home two million dollars

24   a year or one dollar a year.  There's been no

25   evidence.  There's been no paystubs.  There's been no

113

1    testimony from an employer.  There's been no checks.

2    There's been nothing produced.  So we have no way of

3    knowing whether it's at one end of the scale or the

4    other end of the scale.  And I think that that's

5    evidence of bad faith because it's filing a Chapter

6    13 case just to try to take advantage of the super

7    discharge when he's not entitled to it.

8                    THE COURT:  Thank you.

9                    We'll go back to your argument.

10                   Thank you very much.

11                   MR. JOHNSON:  In connection with the

12    assumed name entities, asserting that it is not the

13    law of Illinois that a corporation can assume an

14    assumed name for use in business without prior

15    registration, the state has a very elaborate

16    structure for registration of corporate entity and

17    corporate entity names in order for the express

18    purpose of avoiding fraud and confusion among the

19    public.  In the present instance we have a fair

20    amount of assets in terms of bank accounts and cash

21    flowing through that account that are asserted to be

22    in the name of an entity that is registered neither

23    with the state of Delaware or with the state of

24    Illinois.

25                   THE COURT:  Well, the name you refer

EXHIBIT    14

114

1    to is?

2              MR. JOHNSON:  Sentra Manufacturing

3    Company, Inc., as spelled out and attached to the

4    account.  We have other evidence in the record,

5    verified pleadings of many number in which the debtor

6    has represented himself to be -- to use the

7    designation Central Mfg., Central Mfg. Co. as a d/b/a

8    for his personal activities, and Central Mfg. Inc. to

9    represent a corporate entity of some sort.

10             I believe that the asset that that

11   entity represents, a proprietorship, should have been

12   disclosed in the petition and schedules.

13             THE COURT:  Go ahead.

14             MR. JOHNSON:  Moreover, Your Honor, we

15   have identified a number of areas in the schedules

16   where the land trust and the rental income associated

17   with that should have been listed but were not.  No

18   adequate explanation at law or in fact has been

19   presented for the failure to so list those assets.

20   And the assets are substantial, Your Honor.  Within

21   the last year that was the debtor's largest single

22   asset that if liquidated would return far more to

23   creditors than the $14,000 proposed by the plan.

24             THE COURT:  Repeat that.

25             MR. JOHNSON:  The land if liquidated,

EXHIBIT    3

115

1  the land and property --

2          THE COURT:  The real estate.

3          MR. JOHNSON:  The real estate and the

4  house on it were agreed to be worth about $340,000,

5  the single largest asset the debtor has, or had.

6  Had.

7          THE COURT:  And you are assuming that

8  it could be recouped for a Chapter 7 estate?

9          MR. JOHNSON:  Yes, Your Honor.

10 Transferred to a relative for no consideration with

11 retained control over the land and realization of

12 the --

13         THE COURT:  How long before the

14 filing?

15         MR. JOHNSON:  The transfer occurred

16 March 15, 2005.  The petition was filed December 22,

17 2005.

18         THE COURT:  A year.

19         MR. JOHNSON:  Yes, nine months, Your

20 Honor.  And since he was continuing to collect rent

21 associated with that, as he testified, on a monthly

22 basis, it's unlikely that he could have forgotten

23 about it.  Accordingly, with the view of the other

24 errors and omissions that's found in the schedules

25 that's unrebutted, we believe it's a strong inference

**142**          EXHIBIT   14

116

1    of an actual intent to defraud, and that Chapter 7 is

2    warranted because the creditors would be far better

3    off in a Chapter 7 than a Chapter 13.

4              THE COURT:  Well, what vehicle is

5    there in Chapter 13 for that type of inquiry?  We can

6    hear from the Chapter 13 trustee, perhaps he'd want

7    to comment on that in a few minutes.  But you're

8    assuming that his office is not equipped to do that

9    sort of work.

10             MR. JOHNSON:  I believe he testified

11   that was the case, Your Honor.

12             THE COURT:  It may be he wants to add

13   something to that.

14             MR. JOHNSON:  Yes.

15             THE COURT:  So that's the sum of that

16   argument, is that in Chapter 13 there's no one to

17   mount that attack on the real estate problem?

18             MR. JOHNSON:  That's correct, Your

19   Honor.

20             THE COURT:  Go ahead.

21             MR. JOHNSON:  Moreover, the rent, as

22   the debtor testified, the rent checks and checks from

23   a number of other unincorporated associations were

24   all commingled in that Sentra Manufacturing Company

25   Inc. account.

EXHIBIT    4

117

1          THE COURT:  Counsel, do we have any

2    evidence of that?

3          MR. JOHNSON:  Yes, we do.

4          THE COURT:  What is that exhibit,

5    please?

6          MR. JOHNSON:  I believe that's Exhibit

7    5, Your Honor.  That is the large exhibit of all the

8    checks.  And Exhibit 6 is a summary of the checks and

9    amounts, drafted, summarized in connection with that

10   account.

11         THE COURT:  Does the summary show his

12   annual gross income?

13         MR. JOHNSON:  It shows a sum of cash

14   taken out per year in connection with the account.

15   We do not know, however, whether this is the only

16   account he's ever used.

17         THE COURT:  Does it show how much cash

18   flow is taken out?

19         MR. JOHNSON:  Yes, it does.

20         THE COURT:  What years?

21         MR. JOHNSON:  The last three years,

22   Your Honor.

23         THE COURT:  What's the latest year?

24         MR. JOHNSON:  I believe there is a

25   number to date as of 2006.

118

1                THE COURT:  Does it have '05?

2                MR. JOHNSON:  It has '05 and '04.  We

3    subpoenaed checks for the last three years.

4                THE COURT:  The '05 withdrawals from

5    that account total what?  The '04 and '05 withdrawals

6    from that account total what?

7                MR. JOHNSON:  In Exhibit 6, page 2,

8    paragraph F, 2005 checks written to cash totaled

9    $44,815.26.

10               THE COURT:  In '05?

11               MR. JOHNSON:  Yes.

12               THE COURT:  In '04?

13               MR. JOHNSON:  In '04, $37,341.

14               THE COURT:  Now the '04 tax return

15   that this gentleman filed, he showed gross receipts

16   of $7600, plus some other entries regarding some

17   other business property.  How do these sums shown to

18   be withdrawn relate, if they do at all, to the tax

19   returns?

20               MR. JOHNSON:  They do not, Your Honor.

21   It's wholly inconsistent.  There's far more income,

22   far more cash taken out of the business than is

23   reflected on those income tax returns that were

24   filed.

25               THE COURT:  The withdrawals you speak

EXHIBIT  14

119

1   of, they are in the range, are they not, of the

2   annual monies he claims to have available to him in

3   his income in his Chapter 13 filing?

4              MR. JOHNSON:  Yes.  Yes, in the range.

5    He does not account, however, for, as he testified,

6   checks directed to the rent that were not deposited

7   in any bank account after August of this year.  That

8   does not relevant for 2005.  (sic)

9              THE COURT:  Let's assume arguendo that

10  the house is really his.  What would be the

11  consequence in terms of income available to him?

12             MR. JOHNSON:  Well --

13             THE COURT:  What do we know about the

14  mortgage?  Let me just break it out that way.  What

15  do we know about the mortgage?  Is he liable on the

16  mortgage?

17             MR. JOHNSON:  No, Your Honor.  This is

18  a land trust.  And as such --

19             THE COURT:  -- mortgage --

20             MR. JOHNSON:  It's an unsecured

21  mortgage, so the trustee of the land trust signed the

22  note and the mortgage, but it's a non-recourse --

23             THE COURT:  Was he the trustee at that

24  time?

25             MR. JOHNSON:  No, Your Honor, Midwest

EXHIBIT  14

120

1  Bank and Trust was the named trustee.

2                    THE COURT:  So was he liable on the

3  mortgage?

4                    MR. FACTOR:  Your Honor, if I can

5  explain here because this is related to Illinois land

6  trust law.

7                    The property's held in a land trust.

8  The property is essentially encumbered by a mortgage

9  of about $100,000.  I believe that's in evidence.

10  And we don't know what the monthly mortgage payments

11  are.  We asked that question and the debtor indicated

12  he didn't know what the monthly mortgage payments

13  were.

14                    THE COURT:  Does the evidence show

15  who -- whether any human being is liable on the

16  mortgage?

17                    MR. FACTOR:  The evidence that we saw

18  indicated that the mortgage was non-recourse except

19  for -- so it was non-recourse.  It was just -- the

20  property itself was liable.

21                    THE COURT:  So no individual is.

22                    MR. FACTOR:  So there's no --

23                    THE COURT:  If he's the owner, then

24  he's protecting his ownership by paying the mortgage.

25  If that could be proved.

**147**

EXHIBIT    14

121

1           MR. JOHNSON:  Yes, Your Honor.

2           THE COURT:  Thank you.  Let's go ahead

3   with the argument, sir.

4           MR. JOHNSON:  If the point is that the

5   debtor has testified himself that his income stream

6   is not in fact regular, it depends on whether he can

7   reach a settlement; whether there exists an

8   allegation of an infringement he can make and come to

9   terms.  He's testified that his income stream is not

10  regular, which would be inconsistent with the notion

11  of funding a Chapter 13 plan.

12          Lastly, the debtor has not explained

13  how the creditors are better off if we remain in

14  Chapter 13 compared to a Chapter 7.

15          Lastly, Your Honor, the absence of

16  books and records in connection with his expenses do

17  not permit us to determine accurately what his true

18  income is.  It is possible that he may have been

19  using some of the cash to pay his independent

20  contractors.  We saw no checks directed to them.  We

21  saw no checks directed to taxes associated with them

22  or social security or unemployment.  We have no idea

23  what his true actual income is because he did not

24  have books and records.

25          With that I close.

EXHIBIT    A

122

1           THE COURT:  Thank you.

2           Chapter 13 trustee, do you have any

3    remarks you would like to make?

4           MR. WHEELER:  Briefly, Your Honor.

5    Your Honor, the court already recognized, and I have

6    mentioned it a couple of times in past hearings, that

7    the trustee's position in this matter is essentially

8    such that if the debtor concedes, is willing to

9    concede to dismissal of that matter, the position I'm

10   taking I don't see how they could offer an

11   appropriate defense to conversion because the

12   language of the statute is clear that on a request

13   for a party in interest after notice and hearing that

14   the case may be converted.  So if they're going to

15   concede to dismissal, why in fact wouldn't they be

16   able to concede to conversion of the case?

17          Just a few minutes ago the court asked

18   Mr. Factor a question about confirmability.  And

19   that's important that the court hit on this question

20   because this case, the individual specific facts of

21   this case render it almost impossible to determine

22   the confirmability of the case.  Where do we look at

23   confirmation standards?  We look at 1325(a).  We look

24   at 1325(b).  We look at 1326.  We look at best

25   efforts.  Is the debtor making the best effort to

123

1   repay their creditors?  We look at best interests.

2   Is it in the best interests of the creditors?  We

3   look at good faith.  We also look at some case law in

4   re:  Indiana, or Smith versus Indiana, and Rimgale

5   for our confirmation standards.

6                   But if we take the basic confirmation

7   standards and we look at best efforts, how do we know

8   he's making his best efforts when we can't tell what

9   his income is, what his assets are.  It's too

10  nebulous right now.  This case can go on for years

11  and I don't know that you would ever -- that the

12  court or the trustee would ever get to really learn

13  what's available here.  Clearly, the creditors' best

14  interests are not being represented by the proposal

15  of the plan for confirmation.  That only pays a

16  little over 10,000, between 10 and $20,000 when

17  potentially there is a piece of real property --

18                   THE COURT:  You are talking about

19  payment to the unsecured creditors?

20                   MR. WHEELER:  That's not even the

21  unsecured creditors, that's the total pot.  That's

22  the total pot of money available to everybody that we

23  don't know.  When I say everybody, I don't know what

24  the creditors are out there.

25                   And perhaps most importantly, the

150

124

1   third prong is good faith.  I think that there's been

2   a very, very strong case made by the creditor, Pure

3   Fishing, that good faith has not -- the requirements

4   of good faith have not been met.  Selective memory

5   demonstrated, there's been little or no evidentiary

6   defenses offered to the volumes and volumes of

7   evidence that has been submitted and probably

8   admitted into evidence by the court.  So basically

9   the facts are unique to this case, and render it

10  almost impossible to judge whether it's even in fact

11  confirmable or not.

12           Now, there's no question that

13  confirmation would in fact -- or, excuse me, that

14  conversion would in fact render a better dividend to

15  the creditors than leaving it in Chapter 13.

16           THE COURT:  I think the plan probably

17  calls for more payment to the creditors than you have

18  --

19           MR. WHEELER:  I don't think so.  I

20  think it's $683.

21           Does anybody have a calculator?

22           I think it's a $683 payment -- $693

23  payment over 36 months.

24           THE COURT:  Well, this is a

25  mathematical thing we're going to look at later.  Go

125

1    ahead with the argument.

2               MR. WHEELER:  Now a couple of other

3    requirements I would like to point out.

4               Section 109(e) talks about who is

5    eligible to file in the first place.  Only an

6    individual with regular income that owes on the date

7    of filing the petition non-contingent, liquidated,

8    unsecured debts of less than $307,675 in

9    non-contingent, liquid (sic) or unsecured debts less

10   than $922,975, or an individual with regular income

11   and such individual's spouse, except a stockbroker or

12   commodity broker that owe on the date of filing the

13   petition non-contingent, liquidated, unsecured debts

14   that aggregate less than $307,675, and

15   non-contingent, liquidated secured debts of less than

16   $922,975 may be a debtor under this title.  We don't

17   know what the regular income is.  It's based on

18   fluctuating income and there are no records.  There

19   are no books.  So we don't even know if he's eligible

20   because we don't know the stream of income.  There is

21   no way we could probably ever tell.  I could never in

22   my representation of a Chapter 13 trustee represent

23   to this court I have any faith whatsoever in the

24   debtor making the plan payments.

25               THE COURT:  We do have some evidence

EXHIBIT

126

1    of how he lives.  That is he dips into this account;

2    isn't that right?  That's a stream of income -- a

3    stream of cash.

4                    MR. WHEELER:  It's some stream of

5    cash.

6                    THE COURT:  And it seems to me he's

7    dipping about the same amount as his annual payments

8    that he proposes under the plan.  What have you to

9    say to that form of evidence?

10                   MR. WHEELER:  There's an

11   independent -- it's not enough just to show there is

12   income.  There is an independent duty of the trustee

13   to verify where the money comes from.  In other

14   words, if somebody was a drug dealer and they said,

15   well, hey, they've got a bank account that $10,000

16   goes into a month, and they're making their payments

17   each and every month, they're making the trustee

18   payments each and every month.  Should we not

19   investigate where the money is coming from?

20                   THE COURT:  Can you as an assistant

21   Chapter 13 trustee, or can the Chapter 13 trustee

22   with the aid of assistants such as yourself do that

23   verification process?

24                   MR. WHEELER:  I would like to say that

25   I would be able to do that, but I think it's

153                    EXHIBIT    A

127

1    impractical if not impossible in this matter.  Am I

2    supposed to subpoena -- take -- manage this one case

3    and subpoena every bank record?  Who's really

4    benefiting when in fact the case can be converted to

5    a Chapter 7 and administered faster, counsel can be

6    employed, so that somebody's actually getting paid on

7    this.  It would turn the system on its ear if you had

8    every small business case, quote, unquote, like this

9    one if the trustee were required to administer and go

10   into an investigation.

11             THE COURT:  Have you ever had any

12   experience where your office has actually done this

13   type of investigation on a case of this extent?

14             MR. WHEELER:  This case is -- no.  No.

15   This case is beyond anything I have ever seen.

16             THE COURT:  With regard to this

17   possibility, or let's say facts that indicate at

18   least there should be some inquiry as to whether

19   there was a transfer, fraud of creditors, of the real

20   estate, has your office ever taken any sort of

21   litigation steps to recover property for the estate

22   in Chapter 13?

23             MR. WHEELER:  Not in the nine years

24   that I have been representing a trustee.

25             THE COURT:  Would your office be

EXHIBIT 4

128

1  staffed and equipped to do that?

2          MR. WHEELER:  Not necessarily, no.  I

3  mean, I don't want to make it sound like it would

4  never happen, but if the court directed us to do

5  something, of course we're going to listen to what

6  the court has to say.  It's not an impossibility,

7  certainly.  But, again, the trustee would be in a

8  much -- Chapter 7 interim panel trustee, or whatever

9  the court chooses to call them, would be in a much

10  better position to employ a broker, to get the

11  property administered and get a dividend back to

12  creditors much faster.

13          The other thing we have to keep in

14  mind here is the court can ascertain from a Chapter 7

15  trustee's motions on whether to employ a broker and

16  so forth, make an independent finding of the

17  appropriateness of the action they're taking.  We

18  have a budget, an annual budget that we have to

19  submit to the executive office of the U.S. Trustee

20  system, and it's tight.  There are not a lot of

21  exceptions made for -- you can't all of a sudden have

22  one case that's going to cost $50,000 extra to

23  administer.

24          THE COURT:  In a Chapter 7 a trustee

25  is funded by the estate.  Hopefully.  He or she hopes

EXHIBIT   14

129

1    to be funded by the estate.   In a Chapter 13 the

2    trustee is funded out of fees from collecting and

3    disbursing monies to the creditors in all the

4    estates.   Is that right?

5              MR. WHEELER:   That's correct.

6              THE COURT:   If you had an added

7    addition to your budget, let's call it a bubble of

8    expense in handling a special case which ran up fees,

9    ran up ordinary and reasonable fees of $50,000, would

10   that mean that you have to ask the U.S. Trustee to

11   raise the rates that are going to be paid by all the

12   creditors on your cases?

13             MR. WHEELER:   Quite possibly.   The

14   court recognizes that quite possibly that could

15   happen.   That's typically frowned upon because it's

16   difficult enough to run a business.

17             One of the idiosyncrasies of a Chapter

18   13 business that I was astonished to learn is that we

19   can keep no more than two months of operating

20   reserves at any given time in our budget.   As crazy

21   as that sounds, we are required to keep no more, no

22   less, than two months' operating reserves for a

23   business that distributes $60 million a year.   That's

24   not an easy thing.   And, thank goodness, I'm mainly

25   in the courtroom, I don't deal with that.   But it's a

EXHIBIT   4

130

1    difficult matter.  And taking over a case, two or

2    three like this, I think cases of this nature are

3    going to become more commonplace under the new law.

4    Cases that get bounced from a 7 under a 727 motion to

5    a Chapter 13 are going to become more commonplace.

6    And it's going to be very, very difficult from an

7    accounting standpoint to maintain the integrity of

8    that two-month cushion.

9              THE COURT:  Any final remarks you want

10   to make?

11             MR. WHEELER:  No, Judge.  I think it

12   should absolutely be converted to a Chapter 7.  I

13   don't think it's a close call based on the evidence.

14   And I really don't know, I really haven't heard any

15   objections from the debtor as to why the case should

16   or shouldn't be converted.  I guess that bothers me

17   even more that they haven't said strenuously or a

18   reason why it shouldn't be converted.  They just said

19   they will consent to a dismissal.  But they haven't

20   set forth any evidence, reasons, or general argument

21   as to why it shouldn't be converted.

22             Thank you.

23             THE COURT:  Counsel.

24             MR. GOLDING:  Well, at the outset

25   first I will make some reply to the counsels'

157

131

1  observations, I'll call them.

2              With regard to the suggestion that

3  perhaps because we conceded that we would agree to a

4  dismissal, that that's the equivalent of conversion,

5  that's a new wrinkle that I've never heard of.

6              THE COURT:  I'm interested in that

7  argument, but I do not accept it.  Okay?

8              MR. GOLDING:  Well, I don't either.  I

9  won't spend any time on it.

10             First, I think we have to review, if I

11  may --

12             THE COURT:  I think the gist of the

13  argument is that some of the same things that would

14  justify dismissal would justify conversion.  And

15  since you have stipulated or agreed to dismissal,

16  that is tantamount to agreeing to conversion.  I

17  don't think that is correct.

18             MR. GOLDING:  I don't either.  That's

19  a suggestion that anytime somebody comes in to

20  dismiss a case, if Your Honor denies the dismissal on

21  an 11 or 7, would say -- well, on a 7 you wouldn't

22  convert, but on a 13 or an 11 and they come in for a

23  dismissal and you say I'm not going to grant a

24  dismissal, so therefore I must convert the case.

25  That's just not the law; that's just not what

132

1   happens.

2              THE COURT:   So we're both on the same

3   page.   Now let's go on to the other argument.

4              MR. GOLDING:   First, I think it's

5   important that we perhaps review the bidding as to

6   why and what we're here on.   We are here on Pure

7   Fishing's motion to convert or dismiss.   We are not

8   here on confirmation hearing.   I think that much of

9   the evidence that was put in was deduced the other

10  day and today is relevant to confirmation perhaps,

11  but that's not before the court today.   The trustee

12  has filed no objection to confirmation.   He stands

13  before you today and says it's not a confirmable case

14  for this, that or the other reason.   But no objection

15  has been filed to confirmation.   So that's not why we

16  are before Your Honor.

17             We are here under 1307.   I think the

18  court therefore has to rule on this case based on

19  1307 and not other sections of the Code which have

20  not been addressed by motion before the court.   And

21  certainly the arguments, with the exception of one,

22  all -- none of them fall under the ambit of 1307(c).

23             There's been no showing of

24  unreasonable delay by the debtor that is prejudicial

25  to creditors.   There's been no showing of non-payment

133

1   of any fees or charges required under Chapter 123 of

2   Title 120 -- 28.  There's been no failure to file a

3   plan timely under 1231.  There's been no failure to

4   commence making timely payments under Section 1326.

5   There's been no denial of confirmation of a plan.

6   There's been no material default by the debtor with

7   respect to the term of a confirmed plan.  There's

8   been no revocation of the order of confirmation, of

9   course.  There's been no termination of a confirmed

10  plan.  None of those.

11              And sub (9) and (10) are also not

12  relevant here.  This is only on the request of the

13  U.S. Trustee, failure to file within 15 days

14  additional time as the court may allow after filing

15  of a petition of commencement of a case, information

16  required by paragraph one.

17              THE COURT:  Counsel, 1307(c) provides

18  conversion may come for cause, including and then it

19  includes a number of subparagraphs that you can read.

20              MR. GOLDING:  Correct.

21              THE COURT:  So the question is whether

22  there's cause.  Even though there may or there may

23  not be some specified cause within those paragraphs.

24              MR. GOLDING:  That's correct.

25              THE COURT:  That's sometimes called a

EXHIBIT   A

134

1    good faith/bad faith analysis.  But cause is a --

2                    MR. GOLDING:  I'll get back to --

3                    THE COURT:  There have been a number

4    of arguments as to why there are causes in this case.

5                    MR. GOLDING:  I don't think there have

6    been arguments as to confirmation.  There have not

7    been arguments made to the court I believe.

8                    THE COURT:  Sir, what if I find there

9    have not been sufficient records to enable a Chapter

10   13 trustee readily to administer a Chapter 13 case

11   and verify income and expenses of the debtor?

12   "Readily."  Is that cause?

13                   MR. GOLDING:  Cause for what?

14                   THE COURT:  Conversion.

15                   MR. GOLDING:  I don't think it's

16   necessarily cause for conversion.  It might be cause

17   for dismissal.

18                   THE COURT:  If the Chapter 13 trustee

19   cannot readily administer the case among the many

20   thousands of cases that the trustee has to

21   administer --

22                   MR. GOLDING:  If the court were to

23   find that, but the trustee has not -- other than the

24   remarks made in his closing, has not suggested that.

25   The trustee asked the debtor, I can tell the court,

**161**                    EXHIBIT    A

135

1    for additional information at the 341 meeting.  That

2    meeting I have been advised by both the debtor and

3    Mr. Kaplan's office that the documents, additional

4    information requested was supplied to the trustee.

5                THE COURT:  There is not enough

6    records to determine his income.

7                MR. GOLDING:  But the trustee hadn't

8    said that.  The trustee hadn't come before the court.

9                THE COURT:  Pure has certainly argued

10   that.

11               MR. GOLDING:  But not the trustee.

12               THE COURT:  Well --

13               MR. GOLDING:  The trustee is the one

14   who has to administer the case and they didn't make

15   that argument.  They made the argument after Pure

16   Fishing has made their motion, but they didn't make

17   the argument they're the ones that have to

18   administer.

19               THE COURT:  If Pure has proved that

20   there is not sufficient documentation to enable

21   ascertainment of the income of the debtor, if that is

22   proved, you do not accept that as cause for

23   conversion?

24               MR. GOLDING:  I would say it's cause

25   for dismissal.  I'm not going to stand here and

EXHIBIT    A

136

1    consent that that is automatically somehow grounds

2    for conversion, no.

3                    THE COURT:  Well, just assume for the

4    moment that at least it's a possibility, and tell me

5    whether you think there are sufficient records to

6    inform us of his income.

7                    MR. GOLDING:  I think there are

8    sufficient records to inform the court of his income

9    because he testified that the income, his sole income

10   comes from out of this corporation.  And the records

11   before you that, as the court noted, the checks over

12   the last three years are in line with what he

13   suggests his current income is.  He testified that

14   it's somewhat irregular; that occasionally he makes a

15   settlement that may increase it or not make a

16   settlement that won't increase it.  But that his

17   income is ascertainable from those records.  Rightly

18   or wrongly, it's ascertainable from those records.

19   Your Honor asked Pure Fishing that and they answered

20   your question, yes, you know, that's what he gets.

21                    THE COURT:  Anything you would like to

22   say about the standards of the need to preserve books

23   and records from which his financial condition could

24   be ascertained?

25                    MR. GOLDING:  Again, this is a Chapter

EXHIBIT     A

137

1    13 proceeding and I think that with regard to the

2    books and records of the corporation, detailed books

3    and records, I don't think there's been a showing

4    that anything but his -- the money that he takes out

5    of that corporation exists.  I think that's a

6    sufficient showing of what he gets.  And the fact

7    that he doesn't have books and records other than the

8    checking account and what he takes out that he

9    testified is cash, checks made out to cash, is not --

10   is -- is -- that's what he gets.

11              THE COURT:  Was that income to him?

12   He doesn't report that much income.

13              MR. GOLDING:  That's income to him.

14              THE COURT:  He doesn't report it.  We

15   don't have his '05 return.  We have his '04 return.

16   But he didn't report all of the money he took out of

17   the --

18              MR. GOLDING:  He may not have.

19              THE COURT:  So what does that mean?

20              MR. GOLDING:  I'm not sure.  But I

21   don't believe that it means that it's not

22   ascertainable what he's getting for under a Chapter

23   13.  And I don't know whether that's grounds to --

24              THE COURT:  Is an IRS audit the way to

25   ascertain that?

138

1              MR. GOLDING:  No.  I think that there

2    is sufficient ascertainment by knowing what he's

3    taking out of the checking account.  And the fact

4    that he may not have recorded that all on taxes,

5    under 1307 that's not grounds.

6              THE COURT:  All right.  Next point.

7              MR. GOLDING:  One of the arguments

8    made again of course is the creditors would be better

9    off in a Chapter 7.  Certainly, clearly where

10   Congress has set forth what some of the grounds ought

11   to be for 1307 this one is glaringly missing, that

12   creditors are better off in a Chapter 7.  I would

13   think if Congress wanted that to be a measure, it

14   would have been in that list.

15             THE COURT:  Well, the question is

16   whether or not that argument falls within the word

17   cause.  And the specific argument they made was that

18   there's suspicious circumstances surrounding the real

19   estate and somebody ought to take a look at that.

20   What do you say about that subject?

21             MR. GOLDING:  Well, I can say the same

22   thing today which I said about that the other day,

23   which was that if there is a cause there, those are

24   the grounds that the debtor would amend the plan,

25   with the consent of his daughter; put that property

139

1    into the estate and sell it and pay the creditors.

2    But there's been no finding that it's a fraudulent

3    conveyance.  We haven't tried that case.

4              THE COURT:  What you're saying is if

5    there was such a case and it was tried and it was

6    found there was a fraudulent conveyance, then he

7    would put the case into his plan and distribute it to

8    his creditors.  Is that what you just said?

9              MR. GOLDING:  Yes.  Not exactly what I

10   said the way I said it, but I think that the result

11   is the same, and Your Honor's assessment is correct.

12             THE COURT:  Yes.  And how do you ever

13   get to the analysis?  Who's going to make the

14   analysis?  Do you figure the Chapter 13 trustee is

15   going to make the analysis and file a lawsuit?

16             MR. GOLDING:  The Chapter 13 trustee

17   hasn't even made the allegation.  If he objected to

18   confirmation on the basis that there was a fraudulent

19   conveyance, we could address that and we could deal

20   with that.  We are prepared to do that, but that's

21   not --

22             THE COURT:  Pure argues that's one of

23   the causes, so you can argue it.

24             MR. GOLDING:  Yeah, they argue that

25   it's a cause, but I don't see it as a cause.  And I

140

1  just argued why.  That if it is a cause, if the court

2  were found to find that, we are prepared to address

3  that issue and have the property sold and put the

4  those monies in the plan.

5          I want to point out to Your Honor that

6  the Pure has a contingent --

7          THE COURT:  Pardon me just a second

8  before you -- can you hold the thought --

9          MR. GOLDING:  Try to.

10          THE COURT:  I want to find out what

11  you just meant by --

12          You seem to assume your client has

13  control over the title of this property, the real

14  estate, and if he wanted to could put it into the

15  plan.

16          MR. GOLDING:  He does not.  He has

17  spoken with his daughter, who is the title holder of

18  this property, about the issues.  His daughter lives

19  in Arizona and has allowed mortgages to be put on

20  here to lend money to Mr. Stoller, which is

21  scheduled.  And she -- he tells me he's spoken to her

22  about it and she has consented that if that is an

23  issue, that it could be done.  But she would only do

24  it if the 13 goes on.  Otherwise she'll probably

25  defend a fraudulent conveyance action.

EXHIBIT    4

141

1              THE COURT:  Do we have any evidence as

2  to when the mortgages were put on and how much?

3              MR. GOLDING:  I believe the mortgages

4  -- copies of the mortgages are in the record, Your

5  Honor.

6              THE COURT:  Then when were they put on

7  and how much?

8              (No response.)

9              THE COURT:  Were they put on within

10  the last year, Counsel?

11             MR. GOLDING:  Yes, Your Honor.

12             MR. JOHNSON:  Your Honor, two

13  mortgages, one is dated April 5, 2005, that is

14  Exhibit 3, page 18.  There was another mortgage for

15  99,000, that was directed and realized on December 6,

16  2005.

17             THE COURT:  Just before the filing?

18             MR. JOHNSON:  Yes, 16 days before the

19  filing.  That's Exhibit 3, page 35.

20             THE COURT:  How much?

21             MR. JOHNSON:  That was for $99,000,

22  Your Honor.

23             THE COURT:  What was the first one?

24             MR. JOHNSON:  For 30,000.

25             MR. GOLDING:  Roughly $130,000 in

EXHIBIT

142

1    mortgages.

2              MR. JOHNSON:  I believe the second one

3    subsumed the first, which is why the check issued for

4    the second was for a lesser amount.

5              THE COURT:  Counsel, were those

6    scheduled?

7              MR. GOLDING:  Were the mortgages

8    scheduled?

9              THE COURT:  Yes.

10             MR. GOLDING:  It's not your debt.  You

11   are not on the --

12             THE COURT:  Were those mortgages

13   scheduled?

14             MR. GOLDING:  No.

15             THE COURT:  Go ahead with your

16   argument.

17             MR. GOLDING:  You asked me to hold

18   that point that I was about to make -- okay, I recall

19   what it was now.

20             The Pure Fishing movant has a

21   disputed, contingent and unliquidated claim.  They

22   have filed now a claim, although the numbers that

23   have been disputed here are $240,000, but they filed

24   a claim in excess of $700,000.  But mind you, Your

25   Honor, that's unliquidated.

143

1           THE COURT:  No one has asserted that

2 your client is disqualified by the amount of debt.

3 Why are you raising that?

4           MR. GOLDING:  I'm not going to.  The

5 amount is -- I'm not raising it in that regard.  And

6 of course that wouldn't be applicable as -- in the

7 count because it is disputed and unliquidated.  I

8 don't think that anybody could argue about that.

9           The point I'm trying to make is that

10 the court, this court has modified the stay so that

11 the district court can liquidate that amount.  It may

12 very well be that the amount of their claim would be

13 well below what the value of this piece of real

14 estate is and they could be paid a hundred cents on

15 the dollar.  We don't know that.  The court may come

16 back and say, you know, one dollar, no dollars.

17 That's not -- there'd be no relief.  We don't know

18 that.  That has not been determined.  The court

19 clearly did not determine any damages and held that

20 in abeyance.

21           So we are dealing with an objection of

22 one creditor who is nonetheless a disputed and a

23 contingent creditor who ultimately may be paid a

24 hundred cents on the dollar.  I don't know what they

25 should be objecting to at this point if that were the

144

1   case.

2               The last and perhaps -- as it relates

3   to items that the court has briefly pointed out is

4   the bad faith argument.  An argument -- and it is

5   often made in some of the cases you'll find in which

6   I kind of personally fail to understand often, is

7   that creditors -- when creditors file cases in this

8   court or in the bankruptcy court generally, when they

9   are faced with sale of assets, a judgment, or tax

10  liens and levies and the like, that's when they file

11  bankruptcies.  The fact that this debtor filed a

12  bankruptcy when he was otherwise out of money and

13  really couldn't afford to defend this suit anymore,

14  he had paid a lot in attorneys' fees apparently over

15  the years on this and a couple of other matters and

16  he was out of money and he filed this case.  Now the

17  argument is being made, well, he shouldn't have filed

18  the case because he was doing that to avoid a

19  judgment.

20              THE COURT:  Sir, since we heard about

21  those mortgages which gave him some cash flow, can we

22  hear what he did with the money from the mortgages?

23  Do we have any evidence that shows that?

24              MR. GOLDING:  What he did with the

25  money?  No.

145

1          THE COURT:  Does that suggest --

2          MR. GOLDING:  We can put him on the

3    stand.  He can address that.

4          THE COURT:  I don't remember any

5    evidence on that subject.

6          MR. GOLDING:  No, there wasn't, but he

7    could address that.  I know what the answer is.

8          THE COURT:  Does that suggest that he

9    is spending more money than he shows on his expenses?

10          MR. GOLDING:  I don't think so.  That

11    was a loan from his daughter which is scheduled.  And

12    I know he tried to pay some attorneys' fees also and

13    that he could continue to have counsel.  But I guess

14    it didn't work out.  But that was not income to him,

15    it's a loan and it's duly scheduled.

16          THE COURT:  The mortgage?

17          MR. GOLDING:  No, the loan from his

18    daughter is scheduled.

19          THE COURT:  What was that?

20          MR. GOLDING:  $130,000.

21          THE COURT:  So he treats the mortgages

22    as a loan from his daughter is your point.

23          MR. GOLDING:  Well, she did, yes.

24          THE COURT:  So does he on his

25    schedules.

146

1              MR. GOLDING:  Yes, sir.

2              THE COURT:  So he does not show a lot

3    of cash on hand when he filed this; right?

4              MR. GOLDING:  He does not.  And he

5    claims he doesn't have a lot now.  I know that.  I

6    tried to get paid.

7              THE COURT:  It looks like he ran

8    through a big loan in a short time; doesn't it?

9              MR. GOLDING:  I don't think he ran --

10   well, he expended the money, yes.

11             THE COURT:  Does that suggest that

12   he's spending more than his expenses show?

13             MR. GOLDING:  Well, he was.  There's

14   no question that he was -- it would appear to me over

15   the years of his business that very often -- I mean

16   his single biggest expense were attorneys' fees

17   defending or prosecuting these cases.  Some were

18   where he was the plaintiff to enforce his rights, and

19   some were where he was a defendant.  And that was

20   probably the biggest single cost.  I know it was from

21   conversations with him, the biggest single cost of

22   his operation.  But that's his stock and trade you

23   might say, are enforcement of those rights.  And,

24   again, as the court has acknowledged before, there is

25   his character or the nature of his business, which is

147

1    not illegal, is simply not an issue, or should not be

2    one considered by the court.

3                THE COURT:  I have said that, and I

4    believe that.

5                MR. GOLDING:  Okay.  Me, too.

6                THE COURT:  Anything else?

7                MR. GOLDING:  I have nothing else.

8                THE COURT:  Rebuttal?

9                MR. JOHNSON:  Two points, Your Honor.

10   Just two.

11               First is, Mr. Golding argued that the

12   loan money from Julia Bishop was scheduled.  There's

13   nowhere in the schedules that the, either a gift from

14   Julia Bishop in the form of the $99,000 in mortgages,

15   nor a loan in that amount is found in the schedules.

16   Moreover, we note that to the extent that debtor's

17   business incurs legal expenses, so stated with its

18   continued operation, we have a stipulation on the

19   basis of his business, trial stipulation number 47,

20   is that the income of debtor's business is based on

21   false assertions of trademark infringement and/or

22   harm due to registration of the challenged party's

23   trademark application.

24               Yes, that such a business would incur

25   substantial legal expenses, Your Honor.  They are

148

1    not, however, reflected on the schedule of his

2    expenses.  We factored those expenses in.  If they

3    are to continue, debtor does not have a viable

4    business.  He cannot continue to return income to

5    himself by continuing to operate an illegal business

6    with legal expenses that far outstrip his income.

7               With that, I close.

8               THE COURT:  Is that it?

9               MR. JOHNSON:  Yes, Your Honor.

10              THE COURT:  Anything else you want to

11   say, Mr. Golding?

12              MR. GOLDING:  Surrebuttal?

13              Well, just again, we're mixing the

14   expenses of the business with his personal income.

15   And the money that he's been getting out of the

16   business net of those expenses over the years, that's

17   all.  And his daughter was scheduled as a creditor.

18              THE COURT:  Thank you very much.

19              MR. GOLDING:  Thank you, Your Honor.

20              THE COURT:  I intend to write -- I

21   intend to enter findings of fact, conclusions of law

22   in detail which will fully explain my reasons.  But I

23   can tell you my ruling now.  And I'm going to enter

24   the order tomorrow morning, if you will get it to me,

25   and make it nunc pro tunc today as I announce it.

1              I am converting to Chapter 7.   There

2     are a number of reasons, but I'm convinced that the

3     lack of adequate documentation prevents an orderly

4     administration by the Chapter 13 trustee in a Chapter

5     13.  And it is a definite failure, demonstrates

6     definite failure to keep and preserve books and

7     records from which the debtor's financial condition

8     can be ascertained within the standards required in

9     bankruptcy.

10             Secondly, there are suspicious

11    circumstances concerning the real estate.  A Chapter

12    13 trustee is not equipped to do heavy litigation.

13    And indeed if they tried to do that, it would impose

14    a burden upon the debtors who would have to pay more

15    in commissions for the Chapter 13 trustee to fund

16    that litigation.  That is one of the reasons that

17    they have not staffed themselves for litigation.

18             There is a serious problem that has to

19    be investigated and is certainly best done by a

20    Chapter 7 trustee.  That's the second major ground.

21    There are other detailed grounds which I will set

22    forth in findings of fact, conclusions of law.  But I

23    know enough to decide today that I will convert to a

24    7.  As I said, the order will show it as nunc pro

25    tunc today.

EXHIBIT   A

150

1                Mr. Stoller, as of now, sir, the bad

2    news is you're no longer in control of your property.

3    As far as I'm concerned, the Chapter 7 trustee is now

4    in control of your property.  And I will confirm that

5    by an order which will be nunc pro tunc effective

6    today.

7                May I have that tomorrow morning?

8                MR. FACTOR:  Certainly, Your Honor.

9    If we are just talking about an order of that nature,

10   I could perhaps do a minute order right now for

11   reasons stated on the record the case is converted to

12   a Chapter 7.

13               THE COURT:  Well, it doesn't matter

14   since it's nunc pro tunc.  And we can't docket it

15   today anyway.

16               MR. FACTOR:  Okay.  I will submit it

17   tomorrow.

18               THE COURT:  So we'll docket it

19   tomorrow.  Also provide in there that the rule on 10

20   days is waived.  It will be immediately effective.

21               MR. FACTOR:  Yes, Your Honor.

22               THE COURT:  Nunc pro tunc today.  This

23   moots the Chapter 13 trustee's motion.  We now go to

24   Google.

25               MR. BARRETT:  Yes, Your Honor.

151

1              THE COURT:  I'm going to put this in

2    the hands of a Chapter 7 trustee.  We'll do our best

3    to get things moving, see if we can get an

4    appointment on Monday.  I would certainly like to

5    have a Chapter 7 trustee now take a look at your

6    position and what you want to do.  So what I'm going

7    to do I think is set a status on that and try to get

8    a Chapter 7 trustee in there by about a week from

9    tomorrow.

10              What do you think about that?

11              MR. BARRETT:  Well, Your Honor, I do

12    understand why the court feels it has to do that.

13    And certainly we'll accept that.  We ask, though, as

14    we go forward I think what we'll probably do, because

15    I suppose the debtor will still have standing to

16    oppose this motion since it's seeking --

17              THE COURT:  Absolutely.

18              MR. BARRETT:  -- relief against the

19    debtor.

20              THE COURT:  Except that the trustee

21    has to have more responsibility than the debtor at

22    this point.

23              MR. BARRETT:  Especially as a trustee

24    may feel it concerns the estate, obviously.

25              THE COURT:  What?

152

1              MR. BARRETT:  That the motion may

2    concern the estate, which we don't believe it does.

3    But I understand a trustee might want to look at it.

4              THE COURT:  Well, I don't want to make

5    that decision until I get some input.

6              MR. BARRETT:  What I suggest, Your

7    Honor, if we can have a status.  I presume a trustee

8    would be appointed tomorrow or early next week.

9              THE COURT:  We will get the ball

10   rolling tomorrow when I get the order entered.  We'll

11   have it docketed tomorrow.  And I will ask my staff

12   to try and find out who the trustee is as soon as

13   possible.  I don't know how long it takes.  Sometimes

14   it takes several days.  Sometimes not.  So I will

15   just set this a week from tomorrow for status, status

16   and position of Chapter 7 trustee.

17             Once the Chapter 7 trustee is

18   appointed, would you be good enough to send him a

19   copy of your motion and maybe have a talk with him

20   and see what --

21             MR. BARRETT:  Your Honor, we would do

22   that.  In fact, I have a bound copy of the entire

23   motion.  I don't know if the Court has pulled it off

24   the internet, but I can give the court as well an

25   easier, more accessible copy.

153

 1                    THE COURT:  I have your motion.  What
 2  more do we need?
 3                    MR. BARRETT:  All the exhibits.
 4                    THE COURT:  We have your exhibits
 5  here.
 6                    What about September 14th at 11:00
 7  a.m., status and position of the Chapter 7 trustee?
 8                    MR. BARRETT:  Thank you, Your Honor.
 9  We will contact the trustee.
10                    THE COURT:  Tomorrow morning for that
11  order.  Would 11:00 o'clock be convenient?
12                    MR. FACTOR:  Yes, Your Honor.
13                    THE COURT:  That order -- back on the
14  record.  The order will say pursuant to remarks from
15  the bench, to be amplified by detailed findings of
16  fact, conclusions of law at the conclusion of this
17  hearing which will be made and entered by the
18  court --
19                    At the conclusion of the hearing,
20  pursuant to the remarks from the bench, as will be
21  amplified by more detailed findings of fact,
22  conclusions of law.
23                    Then go ahead and prepare the order.
24  Okay, counsel?
25                    MR. FACTOR:  Yes, Your Honor.

                         ( **180**              EXHIBIT    14

154

1              (Which were all the proceedings had in

2              the above-entitled cause, August 31,

3              2006, 1:30 p.m.)

4    I, JACKLEEN DE FINI, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
5    TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25