IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GOOGLE INC., | ) | |
| | ) | Civil Action No. 07 CV 385 |
| Plaintiff, | ) | |
| | ) | Hon. Virginia M. Kendall |
| vs. | ) | |
| | ) | Hearing Date: October 13, 2009 |
| CENTRAL MFG. INC. a/k/a CENTRAL | ) | Hearing Time: 9 a.m. |
| MFG. CO., a/k/a CENTRAL MFG. CO. | ) | |
| (INC.), a/k/a CENTRAL | ) | |
| MANUFACTURING COMPANY, INC. | ) | |
| and a/k/a CENTRAL MFG. CO. OF | ) | |
| ILLINOIS; and STEALTH INDUSTRIES, | ) | |
| INC. a/k/a RENTAMARK and a/k/a | ) | |
| RENTAMARK.COM, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR ENTRY OF STIPULATED
## PERMANENT INJUNCTION AND FINAL JUDGMENT

Plaintiff Google Inc. ("Google") respectfully requests that the Court enter the Stipulated Permanent Injunction and Final Judgment (the "Injunction and Final Judgment"), lodged concurrently herewith, that has been agreed to by the parties in complete and final resolution of this action.

### Background

Defendants to this action are two corporate entities, Central Mfg. Inc. ("Central Mfg.") and Stealth Industries, Inc. ("Stealth") (Central Mfg. and Stealth are, collectively, "Defendants"). Defendants' former principal, Leo Stoller ("Debtor"), filed Chapter 13 bankruptcy proceedings on December 20, 2005.[1] Subsequently, on August 31, 2006, the Bankruptcy Court converted Debtor's bankruptcy to one under Chapter 7 for, among other reasons, Debtor's failure to maintain books or records (including for the Defendants and other entities in which he claimed

---

[1] Declaration of Michael T. Zeller in Support of Motion for Entry of Stipulated Permanent Injunction and Final Judgment, dated September 30, 2009 and filed concurrently herewith ("Zeller Dec."), Exh. 1.

an interest) and his failures to disclose assets.[2] By Order dated October 5, 2006, the Bankruptcy Court duly authorized the Trustee to act on behalf of the Defendants.[3]

On July 24, 2009 and August 7, 2009, the Bankruptcy Court held an auction hearing for the sale of assets in Debtor's bankruptcy estate, including the stock and assets of the corporate entity Defendants.[4] On August 8, 2007, the Bankruptcy Court approved a sale to The Society for the Prevention of Trademark Abuse, LLC (the "SPTA").[5] In doing so, the Bankruptcy Court found:

> Sound business reasons exist for the Trustee's sale of the Assets pursuant to the APA [Asset Purchase Agreement]. Entry into the APA and the consummation of the Sale contemplated thereby constitute the exercise by the Trustee of sound business judgment and such acts are in the best interests of the Debtor, his estate and its creditors;
>
> [T]he Society for the Prevention of Trademark Abuse, LLC . . . made the only offer received for the Assets within the time period ordered, which offer was in the amount of $7500.00;
>
> [T]he APA [Asset Purchase Agreement] and the transactions contemplated by the APA were negotiated and have been and are undertaken by the Trustee and the [SPTA] at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code; and
>
> The Purchase Price under the APA is fair and reasonable and is sufficient value for the Assets, since it was the only valid offer received. Therefore, the Sale contemplated by the APA is in the best interests of the Debtor and his estate, its creditors and other parties in interest.[6]

Having obtained the Bankruptcy Court's approval, the Trustee and the SPTA entered into an assignment dated August 20, 2007 (the "Assignment").[7] The Assignment transferred to the SPTA all right, title and interest in the stock and all other assets, including any and all trademark rights, held by the Defendants.[8] On the same day, as the new stockholder of the Defendants, the

---

[2] Zeller Dec., Exhs. 2, 3.
[3] Zeller Dec., Exh. 4.
[4] Zeller Dec., Exh. 5, at 1.
[5] Zeller Dec., Exhs. 5, 6.
[6] Zeller Dec., Exh. 5, at 2-3.
[7] Zeller Dec., Exh. 7.
[8] *Id.*

SPTA removed Stoller from "any and all positions, offices, and capacities in connection with each of the corporations."[9]

On August 10, 2007, Debtor appealed the Bankruptcy Court's August 8, 2007 Order to the District Court.[10] This appeal was dismissed on October 1, 2007.[11] Debtor's motion to reinstate the appeal was denied on April 24, 2009, and his motion to file *in forma pauperis* was denied on May 8, 2009.[12] On May 22, 2009, Debtor appealed the District Court's April 24 and May 8, 2009 rulings to the Seventh Circuit.[13] However, it appears that Debtor's appeal has been dismissed for failure to comply with the fee requirements of Seventh Circuit Rule 3(b)[14] and thus no further appeals are now available to Debtor.

As set forth in its Complaint and discussed below, this action stems from these corporate Defendants' pattern of fraudulent acts that targeted Google for extortion and, in the process, cost Google hundreds of thousands of dollars in damage -- damage that continues to this day. Google and the SPTA have come to a resolution regarding Google's Complaint, consisting of the entry of the Injunction and Final Judgment in this action. The Injunction and Final Judgment is intended to ensure that Google is protected against further repetition of Defendants' misconduct.

## Summary Of Facts Giving Rise To Suit

### A. Defendants' History Of Vexatious Litigation.

Defendants are two corporate entities, Central Mfg. and Stealth. Debtor, who is currently in Chapter 7 bankruptcy, has claimed to be Defendants' former principal and to have employed at least another three others in conducting the affairs of Defendants.[15] As discussed above, the Defendants are now owned and under the control of the SPTA, and Debtor has no authority over or role with the Defendants.

As the Seventh Circuit, Courts in this District and the Trademark Trial and Appeal Board repeatedly have found, Defendants' affairs for at least the past decade have included an extensive

---

[9] Zeller Dec., Exh. 8.
[10] Zeller Dec., Exh. 9.
[11] Zeller Dec., Exh. 10.
[12] Zeller Dec., Exhs. 11, 12.
[13] Zeller Decl., Exh. 13.
[14] Zeller Dec., Exhs. 14, 15. A search conducted on the Seventh Circuit's PACER website resulted in no matches for the appeal number in the May 28, 2009 Circuit Rule 3(b) Notice, indicating that the appeal was dismissed before being docketed because Debtor failed to pay the docketing fee. Zeller Dec., ¶ 15.
[15] Zeller Dec., Exh. 16, at 14-18.

scheme of fraudulently claiming trademark rights for the purpose of harassing and attempting to extort money out of legitimate commercial actors, both large and small.[16] The judicial decisions awarding fees and otherwise imposing sanctions against Defendants and Debtor for their fraudulent and other illegal conduct, their assertion of rights that they do not own, their pattern of bringing meritless lawsuits and even their fabrication of evidence are legion. Although it has exhibited many facets, Defendants' scheme at its core has involved targeting companies (and sometimes individuals) with threats of litigation that were based on Defendants' false claims to own literally many thousands of trademarks, co-joined with Defendants' offers to "license" their non-existent trademark rights for an amount less than the frivolous litigation would cost the victims. Then, in many instances, if no money was forthcoming, Defendants proceeded to file sham proceedings in the Courts and/or in the Trademark Trial and Appeal Board ("TTAB"). Although Google cannot be sure of the exact number, Defendants instituted in excess of 37 lawsuits in this District alone and filed hundreds of proceedings in the TTAB.[17] At least seven of those lawsuits resulted in fee awards against Defendants, and none of them resulted in any Court decision on the merits granting Defendants relief. As Judge Coar observed in *Central Mfg. Co. v. Brett*, "[n]o Court has ever found infringement of any trademark allegedly held by Stoller or his related companies in any reported opinion."[18]

**B.    The *Pure Fishing* and *Brett* Decisions.**

In late 2005, Defendants were in the process of losing yet two more of the many frivolous lawsuits that they had brought and were facing the prospect of paying significant fee awards. In one, *Central Mfg. Co. v. Brett*,[19] the Court ruled that Defendant Central Mfg. lacked the trademark rights it had claimed and on that basis, among others, entered judgment against it and ordered Defendant Central Mfg. to pay attorney's fees.[20] In reviewing the evidence, the Court found that Defendant Central Mfg. had "engage[d] in a pattern and practice of harassing legitimate actors for the purpose of extracting a settlement amount. The judicial system is not to be used as an aid in such deliberate, malicious, and fraudulent conduct."[21] The Court also found

---

[16]   A summary of examples of these decisions is attached hereto as Appendix 1.
[17]   A list of these cases is attached as Exhibit A to the Complaint and also included in the *Brett* decision, attached as Exh. 17 to the Zeller Dec.
[18]   Zeller Dec., Exh. 17, at 2.
[19]   No. 04 C 3049 (N.D. Ill) (Coar, J.).
[20]   Zeller Dec., Exh. 17, at 30.
[21]   *Id.*, at 27.

that it had offered "questionable, and seemingly fantastical documents" and "inconsistent, uncorroborated, or arguably false testimony" in the suit.[22]

The Seventh Circuit subsequently affirmed. *Central Mfg. Inc. v. Brett*, 492 F.3d 876, 880-81 (7th Cir. 2008). In upholding the fee award on the grounds that Defendant Central Mfg.'s suit lacked merit and had elements of abuse of process, the Court of Appeals observed that Defendant and Debtor not only had given "misleading deposition testimony," but had "effectively made a mockery of the entire proceeding". *Id.* at 883-84.

In the other case, *Central Mfg. Co. v. Pure Fishing, Inc.*,[23] the Court entered judgment against Defendant Central Mfg. as a sanction for its and Debtor's abuse of the legal process and their violations of Rule 11. The Court observed that Debtor "has earned a reputation for initiating spurious and vexatious federal litigation." In the particular case before it, the Court found Defendant Central Mfg., Debtor and their counsel had engaged in "gross misconduct" and "unethical conduct" that included (1) Debtor's signing of pleadings with counsel's name, even though Debtor is not a lawyer; (2) bringing motions "that lacked any evidentiary support" and were otherwise "baseless"; and (3) evincing a "flagrant contempt for this Court" and "an appalling lack of regard" for the judicial process.[24]

### C. Defendants Target Google And Hundreds Of Others.

Soon after the District Court decisions in *Pure Fishing* and *Brett*, Defendants embarked on an expanded scheme. Between November 2005 and July 2006 alone, Defendants filed more than 1800 requests for extensions of time to oppose applications for trademark registrations that had been published by the United States Trademark Office.[25] Such extension requests, by their mere filing, delayed the issuance of each and every trademark registration that was the subject of Defendants' actions.[26] Simultaneous with this proliferation of filings, Defendants sought to extract money or property out of at least many hundreds of applicants by asserting that Defendants purportedly owned rights to all of these many hundreds of marks which were the subject of those applications. Many of these extortionate demands and false representations

---

[22] *Id.*
[23] No. 05 C 725 (N.D. Ill) (Lindberg, J.). Zeller Dec., Exh. 18.
[24] *Id.* Judge Lindberg subsequently ordered Defendants and Debtor to pay in excess of $900,000 in fees and damages and declared them to be "vexatious" litigants. Zeller Dec., Exh. 19.
[25] Zeller Dec., Exh. 20, at 1, 12 (July 14, 2006 Order).
[26] *Id.*, at 12.

directed to applicants for registration are evidenced in Defendants' sham filings with the Trademark Office itself. For example, Defendants' April 12, 2006 request for an extension of time to oppose a trademark application for "VP VENTURES" included the following:

> Please contact (773-589-0915 FAX) VENTURE BRAND LICENSING to resolve this trademark controversy VENTURE v VP VENTURES and/or merely file an Express Abandonment! See rentamark.com, the nationally renowned trademark licensing and enforcement firm since 1974 for all of your VENTURE BRAND LICENSING, trademark valuations, expert witness testimony and trademark litigation support services, ie., brief writing, trademark searches, legal research, appeals, etc.[27]

### 1. **Defendants' Falsely Claim Rights To "Google" And Demand Money.**

It was in this context of Defendants' expanded scheme of making spurious claims to many thousands of marks, and their pattern of unlawfully demanding licensing fees and threatening and filing sham legal proceedings, that Defendants targeted Plaintiff Google. On November 27, 2005, as one of the some 1800 requests for extension of time eventually filed by Defendants with the TTAB, Defendant Central Mfg. sought a request for an extension of time to oppose an application for registration filed by Plaintiff Google for certain goods.[28] Two days later, Defendants sent Google a letter that purported to be on the letterhead of an entity called "GOOGLE BRAND PRODUCTS & SERVICES," which claimed to have been in business "SINCE 1981."[29] In it, Defendants alleged to "hold common law rights" in the mark GOOGLE and to "have been using the similar mark GOOGLE for many years." The attachments to the letter also repeatedly proclaimed Defendants' "ownership of the mark GOOGLE," and contained spurious notices of copyright registration and trademark registration for "Google." In this letter, Defendants threatened to harass Google through legal proceedings -- along with "extensive discovery" that included depositions of Applicant's "executive officers" -- and referenced the fact

---

[27] A copy of this filing is Exhibit C to the Complaint. Many of Defendants' more than 1800 filings included virtually identical language, except that Defendants substituted a different bogus "licensing" entity that purported to have a name supposedly similar to the mark which was the subject of the application -- such as "ELLA BRAND LICENSING," "FINGO BRAND LICENSING," "SKILL BRAND LICENSING," "MERMAID BRAND LICENSING," "DIAMOND BRAND LICENSING," "STRA BRAND LICENSING," "WORKOUT BRAND LICENSING," "FRIENDS NETWORK BRAND LICENSING," "SIFI BRAND LICENSING," "PM BRAND LICENSING," "NANO BRAND LICENSING," "HAPPY BRAND LICENSING," "LAKE BRAND LICENSING" and "RUNNER BRAND LICENSING." *See* Complaint, Exhibit D.

[28] *See* Complaint, Exhibit H.

[29] Defendants' November 29, 2005 letter and its attachments is Exhibit I to the Complaint.

that the mere filing of a legal proceeding, regardless of its lack of merit, would cost Google at least $150,000. In exchange for refraining from inflicting such damage, Defendants demanded that Google either (1) pay them at least $100,000 or a percentage of Google's revenues as a "licensing" fee; or else (2) cease all use of GOOGLE in connection with Google's business.

    **2.    Defendants' TTAB Proceedings Against Google, One Of Which Results In Sanctions Against Defendant Central Mfg.**

After Google refused Defendants' demands, Defendant Central Mfg. then instituted proceedings against Google in the TTAB and the Trademark Office. Two are most pertinent here. <u>First</u>, on March 1, 2006, Defendant Central Mfg. filed Opposition No. 91170256 (the "Opposition") against Google's Application S/N 76314811 for the GOOGLE mark for various goods and services (the "Application").[30] The Opposition was the result of a request for the extension of time to oppose the Application that Defendant Central Mfg. had filed on November 27, 2005 and thus was among the 1800 requests that Defendants had filed with the TTAB beginning in November 2005.

In the aftermath of Defendants' barrage of filings in the TTAB, the TTAB issued a March 28, 2006 Show Cause Order (the "OSC"). The OSC noted that Debtor and the entities he purported to control had engaged in a "pattern of misconduct and abuse of the TTAB's processes" over the course of "many years."[31] It also directed Debtor and Defendants to provide "for *each* of the marks for which you requested an extension of time to file an opposition, evidence that supports a claim that you may be damaged by registration of the mark" and to "demonstrate that the extension requests were not filed for improper purposes but, instead, were based on cognizable rights you may have arising under the Trademark Act."[32]

Subsequently, by Order dated July 14, 2006, the TTAB found that Defendants' response to the OSC did not provide any of the proof that the law required and that the TTAB had mandated: "Your submissions do not substantiate your rights in *any* of the claimed marks, let alone support a colorable claim of damage.... *You submitted no evidence of products or services bearing these alleged marks, no evidence that you have sold any products or services under these marks, and no evidence of your advertising of goods or services with these marks*."[33]

---

[30] Zeller Dec., Exh. 21.
[31] *Id.* ¶ 21, Exh. 20, at pp. 1-2 (July 14, 2006 Order).
[32] *Id.*, at 2-3, 9 (emphasis added).
[33] *Id.*, at 9 (emphasis added).

Indeed, as the TTAB observed, the evidence Defendants did provide only served to "reinforce the conclusion that you are holding up thousands of applications in an attempt to coerce applicants to license, i.e., 'rent,' trademarks to which you have not demonstrated any proprietary right."[34] The TTAB accordingly found that Defendants lacked "a colorable claim" and had "filed the extension requests *for improper purposes, namely, to harass the applicants to pay you to avoid litigation or to license one of the marks in which you assert a baseless claim of rights.*"[35]

For those violations, which constituted "egregious" misconduct, the TTAB imposed an array of sanctions.[36] One sanction included the TTAB's outright dismissal of Defendant Central Mfg.'s Opposition proceeding against Google.[37]

Second, Defendant Central Mfg. also brought a Cancellation proceeding, No. 92045778, against Google in the TTAB, which proceeding was instituted on May 8, 2006 (the "Cancellation Proceeding"). The Registration that Defendant sought to cancel is No. 2806075 for GOOGLE for specified goods and services in International Classes 38 and 42. In its Petition for Cancellation, Defendant Central Mfg. again claimed that it owns "Common Law rights in and to the mark GOOGLE."[38]

### 3. Examples Of Defendants' Further Misconduct Against Google.

Not content with harassing Google with TTAB proceedings in Defendants' gambit to extract money, Defendant Stealth (under the d/b/a Rentamark) began representing to the public in approximately April 2006 that "GOOGLE" was among the marks it purported to "own and control" and that it was offering for licensing to third parties.[39] In addition to the fabricated "Google" documents mentioned above, Defendants also continued to circulate additional bogus commercial documents, including fax sheets and address labels, supposedly evidencing an entity

---

[34] *Id.*, at 9-10.
[35] *Id.*, at 11-12 (emphasis added).
[36] *Id.*, at 12-13. These sanctions included vacating "each request for extension of time to oppose" Defendants or Debtor had filed between November 2005 and July 2006; prohibiting them or any attorney on their behalf from filing requests for extension of time for two years; and permanently prohibiting Debtor and Defendants from appearing before the Board for purposes of filing any requests for extension of time.
[37] *Id.* ¶ 21, Exh. 20, at 1-2 (July 30, 2006 Order).
[38] Zeller Dec., Exh. 22 (Petition for Cancellation, ¶ 4). The Cancellation Proceeding was later dismissed by the TTAB in view of the SPTA's motion to (1) be substituted as party-plaintiff in the proceeding; and (2) withdraw all pending motions in the proceeding and the opposition with prejudice. Zeller Dec., Exh. 23.
[39] *See* Complaint, Exhibit M; *see also* Complaint, Exhibits F and G.

they variously called "GOOGLE™ BRAND TRADEMARK LICENSING" and "GOOGLE LICENSNING [*sic*]."[40] Simultaneously with these activities, Defendants engaged in other acts of harassment and extortion, including by threatening to "refe[r]" Google's top-level executives "to the US Attorney" for a spurious "perjury charge."[41] Defendants repeatedly threatened to publicize their fabricated allegations, which they claimed would mean "Google's stock won't be worth $5.00 a share" and would result in "the total destruction" of Google.[42] After again threatening to publicize their allegations with the intention of "driv[ing] down Google stock price," one such communication concluded with the statement: "I would not be surpirsed [sic] if Google goes out of business by the conclusion of this proceeding."[43]

### **Grounds For This Motion**

As the Supreme Court has stated, District Courts may properly enter a consent decree where it (1) "spring[s] from and serve[s] to resolve a dispute within the courts' subject-matter jurisdiction"; (2) "come[s] within the general scope of the case made by the pleadings"; and (3) furthers the objectives upon which the complaint was based. *Local No. 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 525-26, 106 S. Ct. 3063, 3077 (1986). "However, in addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree. Therefore, a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." *Id.* As one Court of Appeals has stated, "the parties enjoy wide latitude in terms of what they may agree to by consent decree and have sanctioned by a court." *Conservation Law Foundation of New England, Inc. v. Franklin*, 989 F.2d 54, 59 (1st Cir. 1993); *see also United States v. Bliss*, 133 F.R.D. 559, 567 (E.D. Mo. 1990) ("Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved.").

Google respectfully submits that the Injunction and Final Judgment amply satisfies these standards. Entry of the Injunction and Final Judgment will result in a resolution of Google's monetary claims against Defendants while also providing Google with the injunctive relief that it needs to avoid further, protracted litigation that will burden Google and the judicial system.

---

[40] Examples of these are attached as Exhibits J, K and L to the Complaint.
[41] Complaint, Exhibit O.
[42] Complaint, Exhibit R.
[43] Complaint, Exhibit S.

Thus, the Injunction and Final Judgment comes within the general scope of the case as reflected by the pleadings, and its entry would further the objectives upon which the Complaint was based. Because the Complaint alleges federal claims within the Court's federal question jurisdiction and a pendent state law claim within the Court's supplemental jurisdiction, the Injunction and Final Judgment springs from and serves to resolve a dispute within its subject matter jurisdiction.[44] Finally, Google submits that the resolution here is fair and reasonable.

### Injunctive Relief Is Warranted

As discussed below, prospective relief in the form of an injunction is warranted for two principal reasons, notwithstanding the SPTA's status as successor in interest to the Defendants.

*First*, the law has long considered the continuing effects of past illegal conduct to be an important factor in justifying injunctive relief. *Int'l Salt Co. v. United States*, 332 U.S. 392, 400-01 (1947) (abrogated on other grounds by *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 126 S.Ct. 1281 (2006)). Indeed, even where the challenged conduct has voluntarily ceased, an injunction is still warranted unless "interim relief or events have completely and irrevocably eradicated *the effects* of the alleged violation." *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 874 (5th Cir. 2000) (emphasis added).

Here, the harm to Google is on-going and can be brought to a final, certain end only by a District Court injunction. More specifically, Defendants were the ones that spuriously claimed to be the rights holders to GOOGLE and to have rights superior to Google.[45] They also disseminated to the public for years false statements that they owned the GOOGLE mark, that they had the right to license it and that they had even cancelled Google's registration. An

---

[44] Although the SPTA has dissolved both of the Defendants (Zeller Dec., Exhs. 24, 25), this does not prevent them from being subject to continued suit here or from stipulating to judgment. Courts in this Circuit look to state law in analyzing a dissolved corporation's ability to sue or be sued. *See Sharif v. Int'l Dev. Group Co., Ltd.*, 399 F.3d 857, 860-61 (7th Cir. 2005) (applying Illinois corporate survival statute 805 ILCS 5/12.80). Under both Illinois and Delaware state law, a corporation can participate in litigation after being dissolved if the litigation is initiated before or within five years or three years, respectively, after dissolution. *See* 805 ILCS 5/12.80 (corporation can sue or be sued on claims brought before and up to 5 years post-dissolution); 8 Del.C. § 278 (same, for 3 years post-dissolution). Here, because the complaint in this action was filed on January 19, 2007, and the SPTA submitted filings in 2008 to dissolve the Defendants, this suit easily meets either State's corporate survival statute. Zeller Dec., Exhs. 24, 25.

[45] Indeed, in proceedings in the TTAB, Defendant Central Mfg. (and not Debtor) was the sole named Petitioner against Google and repeatedly alleged that it (and not Debtor) was the owner of all right, title and interest in "Google." Zeller Dec., Exhs. 21 (Opposition, ¶ 6-7); 22, (Cancellation, ¶ 4); and 26.

injunction is needed to eliminate any potential for continued confusion and misunderstanding that these falsehoods were intentionally designed to create, especially since at no point did the corporate entities retract or correct them to make clear that Defendants have no such rights. As Defendants themselves admitted it, their targeting of Google was designed to produce a "cloud" over Google's rights and damage its business, which Defendants cited as a reason that Google should simply give in to their efforts to extort money.[46] In short, only an injunction entered by this Court can rectify the continuing and future effects of harm to Google and the public that Defendants' conduct deliberately sought to inflict.

*Second*, and independently, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' '[I]f it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982), and citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).[47] To obtain an injunction, a plaintiff therefore need not prove that it is likely the misconduct will be repeated. *Cf. Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997) ("A trademark plaintiff is entitled to effective relief; and in any doubt in respect of the extent thereof must be resolved in the plaintiff's favor as the innocent producer and against the defendant, which has shown by its conduct that it is not to be trusted. [Plaintiff] is not required to produce evidence that [defendant] is likely to infringe again." (citations and quotations omitted)).

As shown above, the effects of the conduct challenged has not ceased. But even apart from this, it is indisputable that Defendants engaged in a wide ranging pattern of illegal activity that spanned over a decade. Where, as here, a violation has been founded upon systematic wrongdoing, rather than on an isolated occurrence, the Seventh Circuit has observed that a court

---

[46] Complaint, Exhibit I (November 29, 2005 letter stating "As well known to the Applicant, an Opposer in any opposition proceeding has the clear distinct procedural advantage in that there is an automatic "cloud" placed over the Applicant's title to its mark, which will not evaporate until the final court, the Federal Circuit speaks." (emphasis in original)).

[47] Accordingly, unless a party resisting an injunction can also show that "there is no reasonable expectation...that the alleged violation will recur," then an injunction is justified. *Pederson*, 213 F.3d at 874. Because "[v]oluntary cessation of allegedly illegal conduct" is looked upon with extreme skepticism by courts, however, the burden of substantiating such a contention "'is a heavy one.'" *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1388 (5th Cir. 1980) (quoting *W.T. Grant Co.*, 345 U.S. at 632-33).

should be more inclined to issue an injunction. *Commodity Futures Trading Comm. v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979). Furthermore, this activity was not accomplished just by Debtor acting alone. It was also carried out by others who have been employed by, or otherwise represented, Defendants, along with supposed licensees who have likewise colluded with Defendants in their campaign of unlawful behavior.[48] Under these circumstances, the injunction will help avoid a repetition of Defendants' long-standing pattern of misconduct in the future, including by ensuring that no would-be claimant can attempt to argue that it has rights derived from Defendants. This is particularly true since, as one Court put it in finding that an injunction was proper in a trademark infringement case, "if the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives [plaintiff] substantial protection". *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986).

## Conclusion

For the foregoing reasons, Google respectfully requests that the Court enter the Stipulated Permanent Injunction and Final Judgment.

DATED:  September 30, 2009

Respectfully submitted,

GOOGLE INC.

By:  \_\_\_/s/ Michael T. Zeller_____
     One of Its Attorneys

Michael T. Zeller (ARDC No. 6226433)
QUINN EMANUEL URQUHART OLIVER
 & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000 (tel.)/(213) 443-3100 (fax)

Jonathan M. Cyrluk (ARDC No. 6210250)
STETLER & DUFFY, LTD
11 South LaSalle Street, Suite 1200
Chicago, Illinois 60603
(312) 338-0200 (tel.)/(312) 338-0070 (fax)

---

[48] As shown above, Debtor has previously testified that Defendants have had at least three other employees. Furthermore, in the *Pure Fishing* case, the claims were also brought by an ostensible licensee who attempted to advance Defendant Central Mfg.'s spurious claims. *See* Zeller Dec., Exh. 17, at 5.

**Appendix Of Additional Examples Of Decisions**

1.  In *S Industries, Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627-29 (7th Cir. 2001), the Seventh Circuit found that S Industries, Inc. ("SI")[49] and Debtor's assertion of trademark rights was groundless and affirmed an award of attorneys' fees against SI for filing "meritless claims" and engaging in other litigation misconduct, which the Seventh Circuit found was part of a "pattern of abusive and improper litigation with which the company and Lee Stoller, its sole shareholder, have burdened the courts of this circuit." Although this suit resulted in a fee award against SI and/or Debtor, upon information and belief such award has not been paid.

2.  In *S Indus., Inc. v. Stone Age Equip., Inc.*, 12 F. Supp. 2d 796, 798-99, 819 (N.D. Ill. 1998) (Castillo, J.), the Court awarded attorney's fees against SI for its "continuing pattern of bad faith litigation." The Court also found that the documentary evidence submitted by SI and Debtor was "highly questionable" and "perhaps fabricated" and that Debtor's sworn testimony was "inconsistent, uncorroborated, and in some cases, demonstrably false."

3.  In *S Industries, Inc. v. Diamond Multimedia Sys., Inc.*, 17 F. Supp. 2d 775, 779 (N.D. Ill. 1998) (Andersen, J.), the Court awarded fees against SI based on findings that its claims were "patently frivolous" and that it had "apparently taken a legitimate procedure designed to protect trademark rights and turned [it] into a means of judicial extortion."

4.  In *S Indus., Inc. and Central Mfg. Co. v. JL Audio, Inc.*, Opposition No. 110,672, Order of May 13, 2003 (TTAB), the Board stated that "Mr. Stoller's and opposers' litigation strategy of delay, harassment and even falsifying documents in other cases is well documented" and further noted Debtor's history of being "sanctioned, individually, for making material misrepresentations."

5.  In *S Indus., Inc. and Central Mfg. Co. v. Casablanca Indus., Inc.*, Cancellation No. 92024330, Order of Oct. 3, 2002 (TTAB), the Board likewise observed that Defendant Central Mfg.'s and Debtor's "litigation strategy of delay, harassment, and falsifying documents in other cases is well documented."

6.  In *S Indus., Inc. v. S&W Sign Co., Inc.*, Opposition No. 91102907 (Dec. 16, 1999), the Board noted that "[t]he lack of credibility of Mr. Stoller is a matter of public record."

---

[49] SI was the claimed predecessor of Defendant Central Mfg. and Defendant Stealth and purported to "transfer" its alleged rights to Defendants at various points in the 1990s so that Defendants could claim longer use of the phantom marks and thus assert supposed priority in rights against others. Complaint, ¶¶ 13-21, Exhs. A, B.

7. In *S. Indus. Inc. v. Lamb-Weston Inc.*, 45 U.S.P.Q.2d 1293, 1295 (TTAB 1997), the Board found that SI and Debtor had made "fraudulent" statements under oath in order to backdate pleadings filed with the Board.

8. In *Central Mfg. Co. v. Brett*, No. 04 C 3049 (N.D. Ill) (Coar, J.), the Court ruled that Defendant Central Mfg. and Debtor lacked the trademark rights they had claimed and on that basis, among others, entered judgment against them. It further observed that "Stoller appears to be running an industry that produces often spurious, vexatious, and harassing federal litigation" and recited the findings by "several courts in this district" that Debtor and Defendant Central Mfg. are "engage[d] in a pattern and practice of harassing legitimate actors for the purpose extracting a settlement amount." The Court ordered them to pay an award of attorneys' fees based on findings that "Leo Stoller and his companies present paradigmatic examples of litigants in the business of bringing oppressive litigation designed to extract settlement" and that they had offered "questionable, and seemingly fantastical documents" and "inconsistent, uncorroborated, or arguably false testimony." As a further part of that decision, the Court reviewed and summarized the terms of the "settlement agreements" that Debtor and Defendant Central Mfg. alleged evidence their trademark rights and found that they, in fact, confirmed such Defendants had "engage[d] in a pattern and practice of harassing legitimate actors for the purpose of extracting a settlement amount. The judicial system is not to be used as an aid in such deliberate, malicious, and fraudulent conduct."

9. In *Central Mfg. Co. v. Pure Fishing, Inc.*, No. 05 C 725 (N.D. Ill) (Lindberg, J.), the Court entered judgment against Defendant Central Mfg. as a sanction for Defendant Central Mfg.'s and Debtor's abuse of the legal process. In doing so, the Court found that Debtor "has earned a reputation for initiating spurious and vexatious federal litigation." In the case before it, the Court found that Debtor, Defendant Central Mfg. Co. and their counsel had engaged in "gross misconduct" and "unethical conduct" which included Debtor's signing of pleadings with counsel's name even though Debtor is not a lawyer; had brought motions "that lacked any evidentiary support" and were otherwise "baseless"; and had evinced "flagrant contempt for this Court" and "an appalling lack of regard" for the judicial process. In particular, the Court ruled that "Central Mfg. Co., through Mr. Stoller," and their counsel violated Federal Rule of Civil

Procedure 11(b) "by maintaining that Central Mfg. Co. was a Delaware corporation," even though it was not. As it explained:

> Contrary to the statements in Central Mfg. Co.'s initial and amended complaints, it is not an independent legal entity and is not incorporated under the laws of Delaware. Central Mfg. Co. filed an amended complaint with this Court on May 26, 2005 stating that it was a Delaware corporation, while almost simultaneously filing a motion before Judge Hart stating that Central Mfg. Co. was a d/b/a for Central Mfg. Inc. *See Columbia Pictures Industries, Inc. v. Stoller*, et al., 05 C 2052. Plaintiff, through Mr. Stoller, filed this case under a false name. Since the inception of this case, and unquestionably prior to filing the amended complaint, Mr. Stoller knew that he had not incorporated Central Mfg. Co. However, Mr. Stoller likely attempted to conceal this fact from the Court because the trademark registrations that are the basis for the infringement claims, state that Central Mfg. Co., not Central Mfg. Inc., owns sole title to the disputed marks. The conduct of Central Mfg. Co., through Mr. Stoller, is akin to the conduct in *Dotson*. 321 F.3d 663. In *Dotson*, the Seventh Circuit upheld dismissal of a plaintiff's case with prejudice as a sanction for filing suit under a false name. *Id.* at 668. Accordingly, Central Mfg. Co. and Mr. Stoller deserve the same sanction for filing suit on [be]half of a false corporation.

After this decision, Judge Lindberg entered a final judgment against Defendant Central Mfg., Defendant Stealth and Debtor that (1) deemed them to be "vexatious litigants" and thus barred them "from instituting any lawsuit or trademark opposition without prior leave of this Court pursuant to this Court's authority under the All Writs Act"; and (2) awarded Pure Fishing more than $900,000 in attorney's fees and damages. On February 12, 2007, the Seventh Circuit dismissed Debtor's appeal from that judgment.

10. In *Central Mfg. Co. v. Medtronic Sofamor Danek Inc.*, Opposition Nos. 9115485 and 91154617 (TTAB Feb. 19, 2004), the Board imposed Rule 11 sanctions against Defendant Central Mfg. for filing motions that were "without merit, constitute harassment, and can only be assumed to have been brought for purposes of delay."

11. In *Central Mfg. Inc. v. Third Millenium Tech. Inc.*, 61 U.S.P.Q. 1210, 1214-15 (TTAB 2001), the Board found that Debtor and Defendant Central Mfg. had "engaged in a pattern" of submitting papers that were based on "false statements and material misrepresentations." It ruled, in particular, that Debtor and Defendant Central Mfg. had filed requests for extensions of time on the basis of non-existent settlement negotiations and had "acted in bad faith and for improper purposes, i.e., to obtain additional time to harass the applicant, to obtain unwarranted extension of the opposition period, and to waste resources of applicant and the Board."

12.     On March 3, 2007, based on its findings that Debtor's filings in this District "have generally proven so frivolous and wasteful of court resources," the Executive Committee of the Northern District of Illinois has declared Debtor to be a vexatious litigant and barred him from new filings in this Court without prior permission. *In re: Stoller*, Case No. 07 CV 01435 (N.D. Ill.), Order of March 8, 2007. The terms of the Order specifically stated that Debtor was "enjoined from filing any new civil action or proceeding in the United States District Court for the Northern District of Illinois without first obtaining leave" from the Executive Committee in accordance with a specified procedure set forth in the Order. *Id.*

## CERTIFICATE OF SERVICE

      I, Jonathan M. Cyrluk, certify that I caused copies of the forgoing Motion for Entry of Stipulated Permanent Injunction and Final Judgment to be served on all counsel via the Court's CM/ECF online filing system and on:

**Via U.S. Mail and Email**
Leo Stoller
7115 W. North Avenue, #272
Oak Park, IL 60302
E-Mail: ldms4@hotmail.com

**Via U.S. Mail**
Richard M. Fogel, Trustee
Shaw, Gussis, Fishman, Glantz, Wolfson & Towbin, LLC
321 North Clark Street, Suite 800
Chicago, IL 60610
E-Mail: rfogel@shawgussis.com and rfogel@ecf.epiqsystems.com

**Via U.S. Mail**
Lance G. Johnson
The Society For The Prevention Of Trademark Abuse, LLC
10560 Main Street, Suite 220
Fairfax, Virginia 22030
E-Mail: ljohnson@roylance.com

via U.S. Mail and email where indicated this 30th day of September, 2009.

                                        /s/ Jonathan M. Cyrluk